**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ADORERS OF THE BLOOD OF CHRIST, UNITED | ) |
| STATES PROVINCE, N/K/A ADORERS OF THE | ) CIVIL ACTION |
| BLOOD OF CHRIST, UNITED STATES REGION, | ) |
| SUCCESSOR BY MERGER TO ADORERS OF THE | ) CASE NO. |
| BLOOD OF CHRIST, PROVINCE OF COLUMBIA, | ) |
| PA, INC., F/K/A SAINT JOSEPH CONVENT | ) JURY TRIAL DEMANDED |
| MOTHERHOUSE OF THE ADORERS OF THE | ) |
| BLOOD OF CHRIST, COLUMBIA, PENNSYLVANIA, | ) |
| INC., ALSO F/K/A SAINT JOSEPH'S CONVENT, | ) |
| MOTHER HOUSE OF SISTER ADORERS OF THE | ) |
| MOST PRECIOUS BLOOD, COLUMBIA, PA, A/K/A | ) |
| SISTERS ADORERS OF THE MOST PRECIOUS | ) |
| BLOOD, ST. JOSEPH CONVENT, COLUMBIA, PA | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| SISTER SARA DWYER, | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| SISTER MARIA HUGHES, | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| SISTER DANI BROUGHT, | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| SISTER MARY ALAN WURTH, | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| and | ) |
| | ) |
| SISTER THERESE MARIE SMITH | ) |
| 4233 Sulphur Avenue | ) |
| St. Louis, MO  63109 | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |

TRANSCONTINENTAL GAS PIPE LINE COMPANY,  )
LLC,                                      )
c/o CT Corporation System                 )
600 North 2nd Street, Suite 401 )
Harrisburg, PA  17101-1071                )
                                          )
     Defendant   )
                                          )

## **COMPLAINT**

## I.     INTRODUCTION

1.     The Adorers of the Blood of Christ ("Adorers") is a vowed religious order of Roman Catholic women ("Sisters") whose religious practice includes protecting and preserving creation, which they believe is a revelation of God, the sacredness of which must be honored and protected for future generations. The individually named Plaintiffs are all Sisters of the Adorers. Part of the Adorers' religious practice is for the Sisters to protect, preserve, and treasure the land that the Adorers own, recognizing the interconnectedness and oneness that humans have with creation.  The Sisters believe that God calls humans to treasure land as a gift of beauty and sustenance that should not be used in an excessive or harmful way.  The Sisters believe and follow the "Encyclical Letter, *Laudato Si'*, of the Holy Father Francis On Care For Our Common Home." In *Laudato Si'*, Pope Francis provides a comprehensive theological basis and guidance regarding the urgent need for humans to protect and preserve Earth.  It clearly establishes that *how* land is used is an act of a deeply-held religious belief and practice for Roman Catholics.

2.     In 2018, Defendant Transcontinental Gas Pipe Line Company, LLC ("Transco") constructed the Atlantic Sunrise Pipeline ("Pipeline") for transporting fossil fuels (natural gas) across multiple states.  Transco ran the Pipeline directly through property owned by the Adorers in Lancaster County, Pennsylvania, even though Transco knew that the Adorers and the Sisters

opposed their land being used for the installation of a 42" fossil fuel pipeline because it violated their deeply held religious beliefs and practices.  The Adorers, on religious grounds, steadfastly refused to grant Transco a right-of-way for the Pipeline.  Over the Adorers' protests, Transco condemned the Adorers' property and proceeded to construct the Pipeline across it, threatening the Adorers with arrest and imprisonment if they interfered with Transco's pipeline construction.  Over the Sisters' strenuous, sincere, and repeated protests, the Pipeline was put into service in the fall of 2018, substantially burdening the Adorers' and Sisters' exercise of religion.

3.     Transco's actions to force the Sisters to use land that the Adorers own in fee simple to accommodate and facilitate a fossil fuel pipeline in perpetuity is antithetical to the deeply-held religious beliefs and convictions of the Adorers and Sisters.  It places a substantial burden on the Adorers' and Sisters' exercise of religion by taking land owned by the Adorers that the Sisters seek to protect and preserve as part of their faith and, instead, uses it in a manner and for a purpose that actually places the Earth and their property at serious risk.

4.     Transco's actions were done in reckless disregard to the religious beliefs and rights of the Adorers and individual Sisters.  Transco's actions have caused and continue to cause trauma to the Adorers' faith commitment, to their vowed relationship with God's creation and to their call to be responsible stewards of the land they own.  The Adorers are haunted by the helplessness they experience as Transco uses the Adorers' land for a fossil fuel pipeline that harms God's creation in violation of the very religious vows and constitution to which the Adorers have dedicated their lives.   The Adorers and individual Sisters seek monetary and punitive damages for Transco's repeated past and continued violations of their rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"), and they seek any further relief that this Court deems necessary and appropriate under the circumstances.

3

## II.     JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

6.      Jurisdiction also is established under 28 U.S.C. § 1343(a)(4) because this action seeks relief under an Act of Congress providing for the protection of civil rights.

7.      Jurisdiction is further appropriate in this Court pursuant to 42 U.S.C. § 2000bb-1(c), which guarantees judicial relief for a violation of RFRA.

8.      Venue is proper under 28 U.S.C. § 1391(b) because the property at issue is located in this district.

## III.     PARTIES

9.      Plaintiff, the Adorers of the Blood of Christ, United States Region ("Adorers"), is a Missouri nonprofit corporation, with a mailing address of 4233 Sulphur Avenue, St. Louis, MO 63109.  The Adorers own property located in Columbia, Pennsylvania in West Hempfield Township, Lancaster County.

10.      Sister Sara Dwyer is a permanent member of the Adorers and serves as the coordinator of the Adorers' office of Justice, Peace and Integrity of Creation.  Sister Dwyer has a mailing address of 4233 Sulphur Avenue, St. Louis, MO 63109.

11.      Sister Maria Hughes is a permanent member of the Adorers and serves on the Adorers' leadership team.  Sister Hughes has a mailing address of 4233 Sulphur Avenue, St. Louis, MO 63109.

12.      Sister Dani Brought is a permanent member of the Adorers and served as a councilor to the General Administration for the international congregation of the Adorers.  Sister Brought has a mailing address of 4233 Sulphur Avenue, St. Louis, MO 63109.

4

13.     Sister Mary Alan Wurth is a permanent member of the Adorers.  Sister Wurth has a mailing address of 4233 Sulphur Avenue, St. Louis, MO  63109.

14.     Sister Therese Marie Smith is a permanent member of the Adorers.  Sister Smith has a mailing address of 4233 Sulphur Avenue, St. Louis, MO  63109.

15.     Sisters Dwyer, Hughes, Brought, Wurth, and Smith join as Plaintiffs in their individual capacities, all of whom have undertaken a vow to commit their lives to following their religious beliefs as members and in community with other Sisters of the Adorers.  They fall within the use of the term "Sisters" in the Complaint.

16.     Defendant Transcontinental Gas Pipe Line Company, LLC ("Transco") is a Delaware limited liability company with a principal place of business at 2800 Post Oak Boulevard, Houston, Texas 77251-1396.

## IV.     FACTUAL ALLEGATIONS

17.     The preceding paragraphs are incorporated herein by reference.

### A.     THE ADORERS

18.     The Adorers were originally founded in 1834 as a teaching order by St. Maria De Mattias who was born in the small mountain village of Vallescorsa, Italy.

19.     St. Maria De Mattias dedicated her life to the service of God and established nearly seventy schools, most of which were located in under-served towns and rural areas.  She educated women and girls during the political and social upheavals caused by the Napoleonic rule.  Maria was canonized in 2003.

20.     After St. Maria De Mattias began her ministry, other women began to join her work throughout the world, resulting in missions being opened in Europe, the United States, Asia, Africa, Australia, South America, and Central America.

5

21.     In 1870, the Adorers arrived in the United States.  Mother Clementine Zerr founded the Adorers' first American mission in Piopolis, Illinois.  In 1876, she moved the mission to Ruma, Illinois, where she established teaching and hospital ministries, and a center for the Adorers.  In 1893, Mother Clementine began sending Sisters to teach in Kansas, which led to the establishment of a motherhouse in Wichita.

22.     In 1925, the Adorers began a ministry to the elderly and established a center in Columbia, Pennsylvania, which is located within Lancaster County.

23.     In 1929, the vicariates of Columbia, Ruma, and Wichita became provinces, and in October 2000, converged to become the United States Region of the Adorers of the Blood of Christ.

24.     The Constitution of the Adorers of the Blood of Christ is one of the guiding documents for how the Sisters live out their lives and religious mission.  *See* Constitution of the Adorers of the Blood of Christ, attached as Exhibit "A."

25.     Pursuant to their Constitution, the Adorers take vows of poverty, chastity, and obedience and live together in community.  They forgo personal possessions and dedicate their lives to pursuing ministries consistent with their religious beliefs and teachings.

26.     The Adorers are an ecclesial group of women living in community, who practice their deeply-held religious convictions in their day to day actions.   The exercise of their religious beliefs includes:

a.     Making God's love tangible and known through compassionate acts of service through their ministries and lives;

b.     Educating and addressing important issues of social and environmental justice, such as poverty, war, racism, and global warming that separates

6

humans in a way that the Adorers do not believe mirrors their hope for the Kingdom of God;

c.    Celebrating, praying, and deeply reflecting as a part of their individual and communal spirituality; and

d.    Honoring the Earth as a sacred part of God's creation and protecting and preserving the Earth as a gift of beauty and sustenance for future generations.

27.    Sisters Dwyer, Hughes, Brought, Wurth, and Smith have undertaken a vow to commit their lives to following their religious beliefs as members of and in community with other Sisters of the Adorers.

## B.    THE ADORERS' RELIGIOUS PRACTICE OF CARING FOR THE EARTH

28.    The Adorers' religious practice includes protecting and preserving creation, which they believe is a revelation of God, the sacredness of which must be honored and protected for future generations.

29.    Of particular importance to the instant matter is the deep religious conviction of the Adorers and the Sisters that the Earth is a part of God's creation.  In 2005, the Adorers adopted a Land Ethic proclaiming the sacredness of all creation according to their religious beliefs.  *See* Land Ethic, attached as Exhibit "B."

30.    The Adorers' Land Ethic specifically states, among other things, that:

a.    *As Adorers, we honor the sacredness of all creation; we cultivate a mystical consciousness that connects us to the Holy in all of life.*

7

b.  *As students of Earth, we listen intently to Earth's wisdom; we respect our interconnectedness and oneness with creation and learn what Earth needs to support life.*

c.  *As prophets, we reverence Earth as a sanctuary where all life is protected; we strive to establish justice and right relationships so that all creation might thrive.*

d.  *As advocates of Earth, we choose simple lifestyles that avoid excessive or harmful use of natural resources; we work in solidarity with all creation for a healthy and sustainable lifestyle.*

e.  *As ASC community, we treasure land as a gift of beauty and sustenance; we see it as a legacy for future generations.*

31.  The Adorers believe God calls Christians as a religious imperative to treasure land as a gift of beauty and sustenance that should not be used in an excessive or harmful way.

32.  Accordingly, part of the Adorers' religious practice is for the Sisters to protect, preserve, and treasure the land that the Adorers own, recognizing the interconnectedness and oneness that humans have with creation.

## C.  CATHOLIC TEACHING ON CARING FOR THE EARTH AND CLIMATE CHANGE

33.  The Adorers are a "pontifical" congregation of religious women, meaning their international congregation is recognized and approved by the Vatican, and the Adorers and the Sisters are subject to the authority of the Pope.

34.     In 2015, Pope Francis issued an encyclical letter titled "*Laudato Si'* of the Holy Father Francis On Care For Our Common Home" ("*Laudato Si'*").  *See Laudato Si'*, attached as Exhibit "C."

35.     In *Laudato Si'*, Pope Francis provides a comprehensive and exhaustive theological basis establishing that, as an act of religious belief and practice, members of the Roman Catholic Church, and others, must protect and preserve the Earth as God's creation.

36.     According to the Pope, "Climate change is a global problem with grave implications: environmental, social, economic, political and for the distribution of goods.  It represents one of the principal challenges facing humanity in our day today."  ¶ 25.

37.     Pope Francis specifically identifies the threat of climate change based, *inter alia*, "on the great concentration of greenhouse gases released mainly as a result of human activity" which is "aggravated by a model of development based on the intensive use of fossil fuels . . .."  ¶ 23.

38.     Indeed, a primary cause of global warming is human activity that releases carbon into the atmosphere, most significantly the burning of fossil fuels.  The construction of new, high-volume fossil fuel pipelines facilitates more extraction and use of fossil fuels, thereby accelerating human-created climate change.

39.     A report published in the journal *BioScience* on November 5, 2019, and signed by more than 11,000 scientists from around the world, declares "clearly and unequivocally that planet Earth is facing a climate emergency."  *See* BioScience, "World Scientists' Warning of Climate Emergency," Nov. 5, 2019, attached as Exhibit "D."

40.      The report states that "[t]he climate crisis has arrived and is accelerating faster than most scientists expected.  It is more severe than anticipated, threatening natural ecosystems and

the fate of humanity." *Id.* at p. 2 (citations omitted).

41.     One of the actions the report recommends to lessen the worst effects of climate change is to "quickly implement massive energy efficiency and conservation practices and . . . replace fossil fuels with low-carbon renewables and other cleaner sources of energy if safe for people and the environment.  We should leave remaining stocks of fossil fuels in the ground[.]" *Id.* at p. 4 (emphasis added).

42.     The Summary Findings of the National Climate Assessment report, issued by the United States Government in 2018 (attached as Exhibit "E"), provides similar warnings regarding the effects of climate change in the United States.

43.     The report concludes that "*the evidence of human-caused climate change is overwhelming and continues to strengthen, that the impacts of climate change are intensifying across the country, and that climate-related threats to Americans' physical, social, and economic well-being are rising*.  These impacts are projected to intensify—but how much they intensify will depend on actions taken to reduce global greenhouse gas emissions and to adapt to the risks from climate change now and in the coming decades." *Id.* at p. 36 (emphasis in original).

44.     Pope Francis articulates that the religious beliefs of Catholics connecting them to God's creation require them, as a matter of religious practice, to directly address the harm caused to the Earth by global warming and climate change.  He refers to this connection as "A Universal Communion" in which "as part of the universe, called into being by one Father, all of us are linked by unseen bonds and together form a kind of universal family, a sublime communion which fills us with a sacred, affectionate and humble respect." *Laudato Si'* ¶ 89.  "Everything is connected. Concern for the environment thus needs to be joined to a sincere love for our fellow human beings and an unwavering commitment to resolving the problems of society."  ¶ 91.

45.    Based on this deep spiritual connection to the Earth and the environment, and in light of the ecological crisis at hand, Pope Francis summons Christians to an "ecological conversion," "whereby the effects of their encounter with Jesus Christ become evident in their relationship with the world around them.  Living our vocation to be protectors of God's handiwork is essential to a life of virtue; it is not an optional or a secondary aspect of our Christian experience."  ¶ 217.  "I ask all Christians to recognize and to live fully this dimension of their conversion.  May the power and the light of the grace we have received also be evident in our relationship to other creatures and to the world around us."  ¶ 221.

46.    "In this framework, along with the importance of little everyday gestures, social love moves us to devise larger strategies to halt environmental degradation and to encourage a 'culture of care' which permeates all of society.  When we feel that God is calling us to intervene with others in these social dynamics, we should realize that this too is part of our spirituality, which is an exercise of charity and, as such, matures and sanctifies us."  ¶ 231.

47.    As outlined in *Laudato Si'*, the Catholic teachings on caring for the Earth, as well as the Adorers' own beliefs and practices, compel the Sisters to exercise their religion by, *inter alia*, (a) caring for and protecting the land the Adorers own; (b) not allowing their land to be used in a way that facilitates harm to the Earth and its inhabitants; (c) developing long-term plans for using the Adorers' land in a manner consistent with their religious beliefs in preserving the sanctity of all of life; and (d) challenging practices and development that harm the Earth.  *See* documents attached at Exhibit "F," providing examples of how caring for the Earth has been a well-established religious practice of the Adorers.

48.    The Sisters have exercised their religious beliefs to protect and preserve God's creation by developing long term plans for the use of the Adorers' land as part of their religious

practice and by actively challenging corporate greed and excess that causes harm to the Earth. By way of example, they have sought to preserve 114 acres of woodlands the Adorers own in Ruma, Illinois; hosted an international Earth Summit at their Province Center in Ruma, Illinois; and challenged the exploitation of resources and land in Guatemala.

49.     Based on their religious beliefs, doctrines and practices, the Adorers hold their land in a sacred trust recognizing that it is God's creation, and they are commanded to care for and protect it as part of their religious practice.

### D.     ADORERS' PROPERTY IN LANCASTER COUNTY, PENNSYLVANIA

50.     The Adorers own land in Columbia, Pennsylvania, located within Lancaster County.

51.     Consistent with their religious beliefs, the Sisters are very intentional about how they use the Adorers' land in Columbia.

52.     For example, the Adorers have used the land to sponsor a retirement community called St. Anne's Retirement Community that provides care to elderly individuals consistent with the beliefs and values of the Adorers.

53.     Even though some of the land the Adorers own in Lancaster County is zoned for commercial development, the Adorers have chosen to use the land for growing agricultural crops by local farmers rather than developing it.

54.     Lancaster County is recognized as having some of the most productive and fertile agricultural lands in the entire country.

55.     Included in the land owned by the Adorers that is used for agricultural purposes is a twenty-four (24) acre tract of land located along Prospect Road, as identified in a deed dated

February 7, 1946, and recorded in the Lancaster County Recorder of Deeds Office at Book U37, Page 110, and known as tax parcel number 30004-621-00000 ("Property").

56.     The Sisters' intentional decision on how to use (or not use) and manage the private land the Adorers own, including how their Property in Lancaster County is or is not used, is an integral part of exercising their well-established and deeply-held religious beliefs as active and engaged stewards of God's Earth.

57.     Consistent with the teaching and beliefs of the Adorers and the Pope, Sisters Dwyer, Hughes, Brought, Wurth, and Smith are committed, as part of their individual religious faith and expression and as vowed members of the Adorers, to care for the land the Adorers own in order to protect the Earth as God's sacred creation.

### E.     TRANSCO'S ATLANTIC SUNRISE PIPELINE

58.     The Atlantic Sunrise Pipeline is an expansion of Transco's existing pipeline system designed to move Marcellus Shale gas more expeditiously and at higher volumes from the fracking fields of northern Pennsylvania primarily to international markets.

59.     Transco already had an existing pipeline system in the region, and the Atlantic Sunrise Pipeline essentially functions as a shortcut between existing, connected facilities.  *See* Map of Atlantic Sunrise Pipeline and existing Transco pipeline system, attached as Exhibit "G."

60.     Accordingly, the Project includes approximately 183 miles of "greenfield pipeline," meaning new pipeline installed and operating in locations where no pipeline previously existed.

61.     The Pipeline consists of multiple subsections, including the "Central Penn Line South."  The Central Penn Line South is a 127.3-mile section of greenfield pipeline that runs from Lancaster County, Pennsylvania to Columbia County, Pennsylvania.

62. The Central Penn Line South involved the installation of a 42-inch diameter pipeline that transports 1.7 million dekatherms (1.7 billion cubic feet) per day of natural gas under high pressure, with a maximum allowable operating pressure of 1,480 pounds per square inch gauge.

63. The overall Pipeline, including the Central Penn Line South section, is essential in facilitating the expanded extraction, development, and use of fossil fuels by transporting natural gas from drilling sites to market.

64. As set forth above, indisputable scientific evidence demonstrates that expanding the use of fossil fuels by developing more drilling, extraction, and conveyance systems contributes to global warming and directly harms the Earth.

65. The development of new high-volume natural gas pipelines, like the Atlantic Sunrise Pipeline, causes environmental harms including but not limited to the following examples.

    a. The drilling and extraction of natural gas from wells and its transportation in pipelines result in the leakage of methane, a primary component of natural gas that is 34 times more potent than $CO_2$ in trapping heat.

    b. Methane leakages from drilling wells and loose pipe fittings pose climate risks and contribute to global warming.

    c. Natural gas development can affect local and regional air quality. Some areas where drilling occurs have experienced increases in concentrations of hazardous air pollutants that harm human health and the environment.

    d. Pipeline construction emissions are also a significant source of air pollution, and Lancaster County is already designated as a "nonattainment" area in that the air quality in Lancaster County is well below federal standards.

14

e. The construction and land disturbance required for gas drilling and pipeline installation can alter land use, streams, rivers, and lakes, and harm local ecosystems by causing erosion and fragmenting wildlife habitats and migration patterns.

f. Natural gas drilling and transportation has contaminated drinking water sources, groundwater, and surface water.

g. The sustained, prolonged use of natural gas pipelines contributes to and accelerates global warming during pipeline construction and operation and also compounds the associated environmental harms which affect the long-term condition and use of effected properties if a pipeline were ever decommissioned.

66. In sum, the development of Transco's new, high-volume natural gas Pipeline directly contributes to global warming and causes other environmental harms that affect the Earth as a whole and affects the environment and eco-systems connected to the properties being used to facilitate the operation of the Pipeline.

**F. TRANSCO'S PROPOSAL TO RUN THE PIPELINE DIRECTLY THROUGH THE ADORERS' PROPERTY**

67. On March 31, 2015, Transco filed an application with the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, for authorization to construct and operate the proposed Atlantic Sunrise Pipeline.

68. FERC is the federal agency that reviews and approves a private company's application for a natural gas pipeline; FERC does not initiate, design, implement, encourage, or compel the construction and operation of a natural gas pipeline.

69.     Pursuant to the NGA, FERC's approval of a pipeline application allows but does not compel a private pipeline company to use the power of eminent domain to take private property without the owner's consent.  15 U.S.C. § 717f (h).

70.     As part of the application process, Transco designed and proposed a route for its Pipeline that went directly through the Adorers' Property.

71.     The Adorers opposed the Pipeline running through their Property on religious grounds, because allowing their land to be used for the installation and use of a 42" natural gas pipeline would harm God's creation and defile the sacred nature of their Property by facilitating the extraction, transportation, and use of fossil fuels, thereby accelerating global warming and climate change.

72.     Use of their land for the Pipeline would be in direct contravention of their previously adopted Land Ethic, the vows taken by the Sisters, the Adorers' Constitution, and the official teaching of the Catholic Church.

73.     Accordingly, the Adorers refused to negotiate or agree to grant any easement rights to Transco for the construction and operation of its natural gas pipeline.

74.     Transco knew that the Adorers opposed on religious grounds their Property being used for the Pipeline in or before 2014.  *See* ROW Agent Contact Report, Atlantic Sunrise, attached as Exhibit "H."

75.     Transco knew that forcing the Pipeline to run through the Adorers' Property would violate their religious beliefs and practices.  *See* Declaration of Matthew Drum, attached as Exhibit "I."

76.     Nevertheless, Transco decided to run its pipeline directly through the Adorers' Property in reckless disregard of their religious convictions.

77.     On about February 3, 2017, FERC issued an "Order Issuing Certificate" ("FERC Order"), for the proposed Atlantic Sunrise Pipeline.

78.     The Order stated that the delegation of the condemnation power subjected Transco "to the regulation of the federal government."  FERC Order, ¶ 67.

79.     The FERC Order was conditional, as it did not authorize any pipeline construction or natural gas activities until Transco obtained additional permits and approvals and was granted a notice to proceed from FERC.

80.     Thus, there was no burden placed on the Adorers' religious exercise at the time the FERC Order was issued.

**G.     TRANSCO'S CONDEMNATION OF THE ADORERS' PROPERTY**

81.     Because the Adorers refused to allow their land to be used for Transco's fossil fuel pipeline, on April 14, 2017, Transco filed a "Verified Complaint in Condemnation of Property Pursuant to Fed. R. Civ. P. 71.1" in the United States District Court for the Eastern District of Pennsylvania against the Adorers seeking to condemn a portion of the Property to force the Adorers to allow Transco to construct, install and operate the Pipeline on the Adorers' private property (Docket No. 5:17-cv-01725-JLS).

82.     On June 20, 2017, as part of Transco's condemnation proceedings, Transco filed an "Emergency Motion" to condemn the Property and also to try to prevent the Adorers from holding a dedication service on the Adorers' Property as a way of expressing their religious beliefs of the sacredness of the Earth and their opposition to the forced taking of their land.

83.     When Transco filed its "Emergency Motion," it was not entitled to possession and could not actually proceed with any work on the Adorers' Property because Transco had not

17

received all of the required court orders and permits from state agencies and had not received a notice to proceed from FERC.

84.　Transco's "Emergency Motion" was filed as a threat to try to stop the Adorers from exercising their religious freedoms, as well as their Constitutional rights to freedom of speech and assembly, on their own Property and further demonstrates Transco's reckless indifference to the religious beliefs of the Adorers.

85.　On July 7, 2017, the District Court denied Transco's emergency motion for possession, and the Adorers proceeded to hold their dedication service at the Property.

86.　The Court's July 7, 2017, Order also declared that, under the Natural Gas Act, Transco had the "substantive right to condemn" an easement across the Adorers' Property to construct and operate Transco's fossil fuel pipeline.

87.　While the Adorers maintain fee simple ownership of the Property, Transco has the right to use the Adorers' Property for its pipeline in perpetuity.

88.　The authority to condemn the private property of a landowner is a power traditionally exclusively reserved to the government.

89.　It is well established that private individuals and companies do not have the right to "take" the private property of others for their own business and profit-making interests and uses.

90.　However, Congress may delegate the power of eminent domain to a private, for-profit company by way of legislation like the NGA.

91.　 By exercising the power of eminent domain, a private company performs a public function and becomes a federal actor that is subject to federal laws and regulations.

92.     Transco was a federal actor acting "under color of law" when it condemned the Adorers' Property and was required to comply with federal laws including complying with the mandates set forth in RFRA.

### H.     THE ADORERS SEEK INJUNCTIVE RELIEF IN COURT

93.     On July 14, 2017, within one week of the condemnation and well before FERC granted Transco permission to commence any construction activities on the Adorers' Property, the Adorers filed a Complaint in this Court seeking injunctive relief under RFRA to prevent Transco from constructing and operating the Pipeline on the Adorers' Property.

94.     Transco's condemnation of the Adorers' Property merely authorized Transco to possess the easement; Transco needed a notice to proceed from FERC before it could commence any pipeline activities on the Property.

95.     The Adorers did not seek any damages at that time because the Pipeline had not even been constructed (much less placed into operation), so there was not yet a substantial burden on their religious practices.

96.     On September 28, 2017, the District Court for the Eastern District of Pennsylvania ("District Court") dismissed the Complaint for injunctive relief for lack of subject matter jurisdiction, holding that pursuant to the NGA the Circuit Court had "exclusive" jurisdiction to "affirm, modify, or set aside" FERC's Order.

97.     On October 2, 2017, the Adorers filed an appeal with the Third Circuit.

98.     On July 25, 2018, the Third Circuit issued an opinion denying the Adorers' appeal based on reasoning similar to that of the District Court.  *See Adorers of the Blood of Christ v. Fed. Energy Regulatory Comm'n*, 897 F.3d 187 (3d Cir. 2018), *cert. denied sub nom. Adorers of the Blood of Christ, U.S. Province v. F.E.R.C.*, 139 S. Ct. 1169 (2019).

99.     However, the Third Circuit noted the following in its decision:

While RFRA expressly provides for damages, *see* 42 U.S.C. § 2000bb-1, it appears that the NGA circumscribes FERC's authority to issue a ruling on the merits of a certificate of public convenience and necessity, *see* 15 U.S.C. § 717f(e), and the Court of Appeals is similarly limited to "affirming, modifying, or setting aside" the certificate, *id.* § 717r(b). Thus, the ability of a RFRA claimant to receive damages through the NGA process may indeed bear on "whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207. The Adorers did not request damages in their complaint; hence, we need not reach this issue today.

*Id.* at 196, n.11.

100.    As a part of the condemnation proceedings, the Sisters and Adores filed a claim for compensation and to present evidence of damages for Transco's violation of the RFRA.

101.    On June 25, 2020, the District Court ruled that it could not consider a claim for RFRA damages as part of the condemnation proceeding.  *See* Memorandum Opinion, No. 5:17-cv-01725-JLS, June 25, 2020 (Doc. 48).

102.    However, the Court noted that "by ruling that the Adorers' religious liberty damages are procedurally improper and therefore cannot be considered in the instant matter, *I am not foreclosing their right under the RFRA to pursue such damages*. As discussed above, RFRA provides that an aggrieved party may bring an action for damages under the RFRA in a judicial proceeding. *Accordingly, the Adorers are free to raise their RFRA claim for monetary damages in a separate action.* My ruling today is limited to barring this type of religious damages in an eminent domain proceeding."  *Id.* at 5.

## I.   THE SUBTANTIAL BURDEN TO THE ADORERS' RELIGIOUS EXERCISE CAUSED BY TRANSCO'S OPERATION OF THE PIPELINE

103.    Meanwhile, on September 15, 2017, FERC issued Transco a Notice to Proceed with construction on the Adorers' Property.

104.    Transco rearranged its construction schedule to commence construction earlier than

planned on the Adorers' Property, starting October 16, 2017.  *See* Pictures of construction of Pipeline on the Property, attached as Exhibit "J."

105.    A number of the Sisters were present on October 16, 2017, to protest Transco's installation of the Pipeline as a violation of their religious practice.

106.    The Sisters, however, were powerless to observe their religious exercise because Federal Marshals were present to ensure no Sister interfered with Transco's construction activities.

107.    On March 25, 2018, the Sisters held a Palm Sunday Service on their Property as a public lament of the suffering of Creation inflicted on their land by the Pipeline.  *See* Palm Sunday Worship Booklet, March 25, 2018, Attached as Exhibit "K."

108.    As Transco's construction of the pipeline neared completion in the summer of 2018, counsel for the Adorers sent a letter to Transco dated August 31, 2018, urging Transco not to commence natural gas service through the Adorers' Property and specifically advising that the Adorers intended to seek damages should that occur.  *See* Letter of Aug. 31, 2018, attached as Exhibit "L"

109.    Transco placed the pipeline in to service on or around October 4, 2018, after receiving final authorization from FERC.

110.    Natural gas presently is flowing through the Adorers' Property in direct violation of the Adorers' religious practice and sincerely-held beliefs.

111.    Transco's action in placing the Pipeline in to service using the Adorers' land caused a substantial burden to the religious exercise of the Adorers in violation of RFRA by forcing them to use their own land, which they hold in sacred trust as God's creation, to facilitate the extraction, transportation and use of fossil fuels that will accelerate global warming and cause great harm to the Earth.

112.   Transco's use, day after day, of the Adorers' property in violation of their deeply held religious beliefs represents a continuing violation of their religious practice because it facilitates harm to the Earth for as long as the Pipeline remains in operation.

113.   Transco's action to condemn and use the Adorers' Property is in furtherance of its for-profit business interest in exporting natural gas to international markets for private financial gain and is not a compelling government interest.

114.   The burden on the Adorers' and Sisters' religious practice is not the least restrictive means for furthering any governmental or private pecuniary interest in the Pipeline because Transco already had existing pipeline infrastructure transporting gas from Northern Pennsylvania even before it constructed the Pipeline, and in any event, the Pipeline could have been routed around the Adorers' Property as has been done in numerous other instances.

115.   As part of their religious practice and belief, the Sisters have refused to allow the use of the Adorers' private property for installation and operation of the Pipeline because the Sisters believe such a use of their land would harm God's creation, violate the sacred nature of their Property, breach the vows they have taken to follow God, contradict the teachings of Pope Francis, and interfere with their right to freely exercise and practice their religious beliefs in the use of their own land.

116.   Transco's actions have caused harm and damage to the Adorers and the Sisters by forcing upon them a fossil fuel pipeline that:

       a.   compromises and breaks their religious vows to protect the Earth as God's creation and violates their call to loving, healthy and life-giving relationships;

b.    creates feelings of helplessness and despair as their land is used to facilitate harm to the Earth and its inhabitants, particularly the poor who are disproportionately impacted by global warming and climate change;

c.    results in suffering to the Adorers and the Sisters as they see their faith, vows, and religious commitments sacrificed for the profit motives and greed of a multi-billion dollar corporation; and

d.    causes a fundamental violation of the very purpose of the Adorers as a vowed religious order who are called by their foundress, St. Maria DeMattias to "bring about that beautiful order of things that the great Son of God came to establish in his blood."

117.    In summary, Transco has acted under color of law to use the private property of the Adorers to install and operate a natural gas pipeline that causes harm to the Earth and its inhabitants, with knowing and reckless disregard of the Adorers' sincerely-held religious beliefs, thereby resulting in significant damage to the Adorers and the Sisters.

## V.    CLAIM FOR RELIEF

### <u>COUNT I</u>

### Violation of the Religious Freedom Restoration Act

118.    The preceding paragraphs are incorporated herein by reference.

119.    RFRA, 42 U.S.C. § 2000bb, *et seq.*, provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can "demonstrate [] that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

23

120.    Under RFRA, "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity."  42 U.S.C. § 2000bb-2 (1).

121.    Congress ensured that "[f]ree exercise of religion [would be] protected" by providing a very specific remedy to aggrieved persons:  entitlement to assert a RFRA claim in a judicial proceeding.  Under the heading "Judicial relief," the statute specifically provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  *Id.*  § 2000bb-1(c).  Indeed, the provision of judicial relief effectuates RFRA's stated purpose "to provide a claim or a defense to persons whose religious exercise is substantially burdened by government."  *Id.*

122.    The term "appropriate relief" includes damages, and both the Third Circuit and the District Court suggested that the Adorers may assert a private cause of actions for damages in district court.

123.    Transco acted under color of federal law when it condemned the Adorers' Property and then proceeded to install, construct, and operate a 42" fossil fuel Pipeline; accordingly, Transco constitutes the "Government" as defined and used in RFRA.

124.    Transco's action to forcibly condemn, construct and operate a high-volume natural gas pipeline on land owned by the Adorers substantially burdened the Adorers' and Sisters' exercise of their deeply-held religious beliefs to use and protect their land as part of God's creation as more fully explained above and as described in the Adorers' Land Ethic and as Pope Francis declared in *Laudato Si'*.

125.    As a result of the substantial burden to their religious exercise, the Adorers and Sisters have experienced harm to their religious beliefs and practices that has caused institutional and individual pain and anguish.

126.    This burden on the Adores' and Sisters' exercise of their deeply held religious beliefs is continuous, occurring every day that Transco operates the Pipeline on their Property.

127.    Transco cannot establish a compelling governmental interest to justify its decision to violate the Adorers' religious rights, particularly when the Pipeline is being used primarily for exporting natural gas and for the financial gain of a private company.

128.    Moreover, Transco did not use the least restrictive means for furthering its own private interests because it could have avoided the Adorers' Property in designing the route of the Pipeline or simply used the existing pipeline network already in place.

129.    Accordingly, Transco has violated the Adorers' and Sisters' rights under RFRA.

## VI.    RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request your Honorable Court to:

(a)    take jurisdiction of this matter;

(b)    grant a trial by jury;

(c)    award Plaintiffs compensatory and punitive damages in such amounts as the jury determines;

(d)    award Plaintiffs prejudgment interest, reasonable attorney's fees, expert fees and costs as permitted by law; and

(e)    award such further relief as the Court may deem appropriate.

Respectfully submitted,

GIBBEL KRAYBILL & HESS LLP

By: _/s/ J. Dwight Yoder_____
    J. Dwight Yoder
    Sheila V. O'Rourke
    Attorneys for Plaintiffs
    2933 Lititz Pike
    P.O. Box 5349
    Lancaster, PA  17606
    (717) 291-1700
    Sup. Ct. Atty. ID. #81985
Date:  November 10, 2020    Sup. Ct. Atty. ID. #313842